UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SHAMECA CAWANIA RODGERS,

          Plaintiff,

                                  Case No. 19-cv-1532-pp

   v.

STATE OF WISCONSIN DHS,

          Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(DKT. NO. 35) AND DISMISSING CASE WITH PREJUDICE**

---

The plaintiff, who is representing herself, filed a complaint after the defendant failed to promote her to open positions for which she had applied. Dkt. No. 1. She alleges that the defendant retaliated against her for taking FMLA leave in 2016 and 2017 and for filing a complaint with the Equal Employment Opportunity Commission in March of 2017. Id. Magistrate Judge Nancy Joseph screened the plaintiff's complaint and allowed her to proceed on a retaliation claim under the FMLA and the Americans with Disabilities Act. Dkt. No. 8 at 4.

The defendant has filed a motion for summary judgment and provided the plaintiff with copies of Federal Civil Rule of Procedure 56 and Civil Local Rules 56(a), (b) and 7 (E.D. Wis.). Dkt. No. 35. The plaintiff filed a nine-page handwritten response, dkt, no. 43, along with a 113-page exhibit. Dkt. No. 43. The court has reviewed the entire record and concludes that the defendant is

1

entitled to sovereign immunity on the FMLA claim. As to both claims, the plaintiff has not presented any evidence—beyond speculation—that the defendant retaliated against her for engaging in protected activity. The court will grant the defendant's motion and dismiss the case.

## I. Factual Background

Civil Local Rule 56(b)(1)(C) requires that a party filing a motion for summary judgment also file "a statement of proposed material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." That statement of proposed material facts must be made up of short, numbered paragraphs, each containing a specific fact (no more than 150 paragraphs), and each paragraph must cite to specific evidence in the record. Civil L.R. 56(b)(1)(C)(i) and (ii). A party *opposing* a motion for summary judgment must respond to the moving party's statement of proposed material facts, reproducing each of the moving party's numbered paragraphs and then indicating whether she agrees or disagrees with the fact and citing evidence in support of any disagreement; she also may file her own proposed statement of material facts, in short, numbered paragraphs. Civil L.R. 56(b)(2)(B)(i) and (ii).

The defendant filed its motion for summary judgment and a brief in support of that motion. Dkt. Nos. 35, 36. The defendant also complied with Civil L.R. 56(b)(1)(C), filing a document titled "Defendant's Proposed Findings of Fact" that contains 107 proposed findings of material fact. Dkt. No. 37. Finally, the defendant filed evidence—exhibits and sworn declarations. Dkt. Nos. 38-41.

In response, the plaintiff filed a nine-page document titled "Plaintiff's Reply to Motion for Summary Judgment." Dkt. No. 43. The document is divided into sections: "Plaintiff's Reply to Motion for Summary Judgment" consists of five numbered paragraphs; "Plaintiffs Reply to Summary of Facts" consists of twenty numbered paragraphs; "Plaintiff's Reply to Rodgers Employment with Miles" contains paragraphs numbered twenty-one through forty two; "Plaintiff's Reply to Argument" has no numbered paragraphs; "I. Retaliation Claim:" contains numbered paragraphs forty-three through eighty-seven. It appears that in part, the plaintiff intended this document to be a response to the defendant's proposed material findings of fact; in some of the numbered paragraphs, she simply states, "I agree." Dkt. No. 43 at 2, ¶¶2-4. But the plaintiff's eighty-seven numbered paragraphs do not correlate with the defendant's 107 numbered paragraphs in its proposed findings of fact.

Nor did the plaintiff support her proposed findings of fact—if that is what she intended them to be—with evidence from the record. At a January 20, 2022 telephonic status conference, the court advised the parties that their proposed findings of fact "must be supported by evidence collected in discovery." Dkt. No. 42 at 1. The plaintiff's filing does not cite to any evidence in the record. To the extent that the plaintiff intended her pleading at Dkt. No. 43 to be either a response to the defendant's proposed findings of fact or to be her own proposed findings of fact, the document does not comply with the court's local rule or with this court's directions from the January 20, 2022 status conference.

The plaintiff *did* attach to her pleading 113 pages of documents. She did not reference any of these documents in her pleading or explain how they related to her claims. "In considering a motion for summary judgment the court is not "'obligated . . . to assume the truth of a nonmovant's conclusory allegations on faith or to scour the record to unearth material factual disputes.'"" Castelino v. Rose-Hulman Institute of Technology, 999 F.3d 1031, 1040 (7th Cir. 2021) (quoting Skiba v. Ill. Cent. R.R. Co., 884 F.3d 708, 722-23 (7th Cir. 2018)). Nonetheless, the court has reviewed the 113 pages of documents the plaintiff filed. It found nothing in those documents that refuted the defendant's proposed findings of fact. Accordingly, the court takes the facts from the defendant's proposed findings of fact and its attached evidence.

A.    Milwaukee Enrollment Services

The Wisconsin Department of Health Services' Division of Medicaid Services operates a bureau called Milwaukee Enrollment Services (MilES), which manages all aspects of income maintenance programs in Milwaukee County. Dkt. No. 40 (Declaration of Tonya Evans) at ¶¶2, 4. Tonya Evans, the Bureau Director of MilES, has held that position since November 2014. Id. at ¶2. Evans directs, coordinates, plans, monitors, and evaluates all operational activities of all MilES staff and the functions required to meet all operational and programmatic priorities, goals, and objectives. Id. at ¶3. Approximately 400 individuals at MilES report to Evans, directly or indirectly. Id. at ¶5.

Due to workload and the importance of MilES' work, it is their policy that employees may not use unplanned personal leave time during the fourth

quarter of the calendar year. Id. at ¶6. MilES has a heavy workload that must be met for the citizens of Milwaukee County who require support. Id. The fourth quarter includes many holidays for which citizens need assistance and there are year-end tasks to complete, including the open enrollment period for the Affordable Care Act. Id. For applicants who are at first denied coverage under the Affordable Care Act, their applications are automatically forwarded to the state and county of the applicant. Id. MilES' applications typically increase by approximately 20% during the Affordable Care Act's open enrollment period. Id. Evans sends a memorandum to all MilES staff each year to remind them of MilES' policy that employees may not use unplanned personal leave time during the fourth quarter of the calendar year. Id. at ¶7; Dkt. No. 40-1. Employees can use pre-approved leave time and sick leave during the fourth quarter. Id. at ¶8.

Employees may use leave under the Family and Medical Leave Act (FMLA) at any time during the year, including during the fourth quarter, and may use their paid leave time to cover any FMLA absences. If an employee uses FMLA leave during the fourth quarter, they may use personal leave to cover the absence. Id. at ¶9. Evans is not notified when a MilES employee applies for and is approved to take FMLA leave. Id. at ¶10. This process is handled between the employee, human resources, and the employee's direct supervisor. Id. However, Evans is informed at a biweekly meeting with human resources when an employee will be out of the office for an extended period time, which may include instances of employees utilizing continuous FMLA leave. Id.

Additionally, just as all employees who call in to indicate that they will not be in for the day, employees with approved FMLA leave are required to state the reason for their absence when calling into work and their attendance record may show an absence designated as "sick-FMLA." Id.

B.    Plaintiff's Employment

The plaintiff began working as an Income Maintenance Specialist 1 within the Department of Health Services Division of Medicaid Services Bureau of MilES on August 26, 2013. The plaintiff reported to Health Care Supervisor Joseph Hooper. Dkt. No. 38 (Declaration of Karin Zbiegien) at ¶4; 38-1 at 4. Joseph Hooper supervised the plaintiff for approximately three years until the plaintiff decided to work at another location closer to her home, where she reported to Health Care Supervisor Tanya Johnson from April 17, 2016 until January of 2018. Dkt. No. 39-1 at 3-4. As a Health Care Supervisor, Johnson is responsible for "overseeing a team of Income Maintenance Specialists to ensure that state regulated policies and procedures are followed while determining eligibility for FoodShare, Medicaid and Childcare programs for customers of Milwaukee County." Dkt. No. 41 (Declaration of Tanya Johnson) at ¶3.

When the plaintiff was hired, there was an income maintenance specialist job title series that included Income Maintenance Specialist 1, Income Maintenance Specialist 2 and Income Maintenance Specialist – Advanced. Dkt. No. 38 at ¶5. As an employee's duties and responsibilities changed to meet a different title within the series, the employee could reclassify

6

into that title; however, if they were at the highest title of the series, they could not be reclassified any further in that series. Id. The plaintiff was granted permanent employment status effective May 25, 2014. Id. at ¶6.

On September 4, 2014, Human Resources Assistant Jennifer Potts recommended the plaintiff be reclassified to an Income Maintenance Specialist 2, based on a review showing the plaintiff was working at the full performance level and had attained the necessary training and experience satisfactory to meet the performance objectives of that title. The recommendation was approved on September 19, 2014. Id. at ¶7.

In August 2015, however, human resources moved away from using a title series within a classification and started "broadbanding." Id. at ¶8. Broadbanding is a program implemented by the State of Wisconsin to address the State's ability to hire within a broader dollar range instead of a single minimum rate. In its simplest terms, broadbanding allows state agencies to pay new employees higher starting salaries when justified by relevant factors. Id. at ¶9. Broadbanding occurs when a group of pay ranges is collapsed into one "band." Id. at ¶10. "For example, one pay band may include classified employees in the classification series 81-04. However, this one classification series covers several non-broadbanded pay ranges—ranges 12, 13, 14, and 15." Id.

With broadbanding, the steps within a classification series were abolished. For example, a classification series that formerly had multiple levels (also called steps), that were differentiated numerically (e.g., 1, 2, 3, etc.) or by

skill level description (*e.g.*, entry, objective, senior, and—at times—advanced) no longer had those steps, or movement options. Id. at ¶11.

Due to broadbanding, the income maintenance specialist title series was eliminated, and the plaintiff's classification title was reallocated from Income Maintenance Specialist 2 to Income Maintenance Specialist. This was not a demotion and the plaintiff' wages did not change. Id. at ¶12. With the change to broadbanding, an employee could no longer reclassify into a new classification title and had to compete in a competitive recruitment when applying for a new position. Id. at ¶13.

C.    Plaintiff's Family and Medical Leave Act Requests

In 2016, the plaintiff explained to her then-supervisor, Joseph Hooper, that she was "going through some things" and he explained to her what Family and Medical Leave Act (FMLA) leave was; the plaintiff thought using FMLA leave was a good idea to protect her employment and comply with the Department's attendance policies while taking absences. Dkt. No. 39-1 at 4, Tr. Page 16 at lines 4-15. On December 30, 2015, the plaintiff submitted a Family and Medical Leave—Employee Request, asking for intermittent leave beginning January 1, 2016. The plaintiff's medical provider indicated that the plaintiff had a chronic condition for which she would need intermittent leave "approximately 0-2 times per month for about three days per episode." Dkt. No. 38 at ¶14. Human resources notified the plaintiff on January 5, 2016 that her request was approved for the period of January 1, 2016 through June 30, 2016. Id. at ¶15. The plaintiff was advised that if her condition persisted

8

beyond June 30, 2016, she would need to submit new documentation and request subsequent approval. Id. The only person outside of human resources who was informed of the FMLA leave was the plaintiff's direct supervisor. Id. at ¶16.

The plaintiff submitted another Family and Medical Leave—Employee Request requesting intermittent leave beginning July 1, 2016. Id. at ¶17. The plaintiff's medical provider reported the plaintiff continued to have a chronic condition for which she would need intermittent leave approximately zero to two times per month for about three days per episode. Id. Human resources notified the plaintiff on July 12, 2016 that her request was approved for the period of July 1, 2016 through December 31, 2016. Id. at ¶18. The plaintiff was again advised that if her condition persisted beyond December 31, 2016, she would have to submit new documentation and request subsequent approval. Id.

The plaintiff submitted a subsequent Family and Medical Leave—Employee Request requesting intermittent leave beginning January 1, 2017. Id. at ¶19. The plaintiff' medical provider again indicated the plaintiff continued to have a chronic condition for which she would need intermittent leave approximately zero to two times per month for about three days per episode. Id. Human resources notified the plaintiff on January 6, 2017 that her request was approved for the period of January 1, 2017 through December 31, 2017. Id. at ¶20. The plaintiff was instructed to submit new documentation and request approval if her condition persisted beyond December 31, 2017. Id. The

9

plaintiff used FMLA leave to allow her approximately two to three absences per month in 2016 and 2017. Dkt. No. 39-1 at 5, Tr. Page 17 lines 19-25. When the plaintiff used FMLA leave she did not talk about the underlying medical condition which necessitated her use of FMLA leave with her supervisor or anyone else at her work. Id. at 20, Tr. Page 78 lines 14-19.

       D.    MilES' Recruitment Process

Recruitment is a competitive process during which applicants are screened and scored by a screening panel and later the top candidates are interviewed by a separate interview panel. Dkt. No. 38 at ¶21. After an open position is posted and it is nearing the application deadline, Karin Zbiegien, MilES' assigned human resources contact, gets in touch with Evans, who assembles a screening panel of two or three staff from the hiring unit to screen applicants using a screening tool provided by human resources. Dkt. No. 40 at ¶11. The screening tool is based on the required qualifications for the position and the preferred qualifications. Dkt. No. 38 at ¶22. For most positions, there is a nine-point scale. Id. The screening panel scores the applicants based on what is written on their resume and in their cover letter. Id. Members of the screening panel are not given access to any employment records of internal applicants; no employment information about internal applicants, including whether they have taken FMLA leave or filed any complaints about their employment, is shared with members of the screening panel. Id. at ¶23. The screening panel also is not allowed to score an applicant based on their

experience with or prior knowledge of the applicant—they may consider only what is submitted with the application. Id.

The screening panel submits their scores to human resources and then Evans determines how many applicants to interview based on the number of open positions. Id. at ¶24. Human resources compiles a certification list which ranks the applicants based on score and gives it to Evans, so she knows how many applicants are being interviewed. Id. It is possible that more candidates will be interviewed than Evans has determined because applicants may have a tied score. Id. Until a certification list has been prepared for a recruitment, Evans is unaware of any names or details regarding the applicants who have applied for an open position. Dkt. No. 40 at ¶12.

No one has the individual authority to remove an applicant from the certification list. Dkt. No. 38 at ¶25; Dkt. No. 40 at ¶13. An applicant may be removed from the certification list only with special written permission from the Department of Administration; if such a written request is made, it is documented and maintained in the recruitment file. Id. There are a few situations in which Evans may request that someone be removed from a certification list, including, but not limited to the following situations:

  a. The applicant was in the agency before and received frequent disciplinary actions.
  b. The applicant was previously terminated from the agency.
  c. The applicant previously worked for the agency and resigned numerous times indicating they do not really want to work at the agency.

Dkt. No. 40 at ¶14. Evans rarely makes requests for someone to be removed from a certification list. Id. at ¶15. When she does, Evans makes such a

11

request through Zbiegien, who informs Evans of the Department of Administration's decision. Id. Evans never has asked for the plaintiff to be removed from a certification list. Id.

After Evans knows how many individuals are being interviewed, she selects an interview panel that is different from the screening panel. Dkt. No. 38 at ¶26; 40 at ¶17. Depending on the number of candidates being interviewed, Evans may select more than one interview panel. Dkt. No. 40 at ¶17. The interview panel consists of at least one internal subject matter expert and one external subject matter expert. Id. The interview panel does not know how the applicants ranked in the screening process. Dkt. No. 38 at ¶26. The interview panel would know personal information about the employee, such as whether an applicant has applied for FMLA leave, only if the applicant's direct supervisor is on the interview panel. Id.

Evans collaborates with human resources to develop the interview questions. Dkt. No. 38 at ¶27; Dkt. No. 40 at ¶16. All interviewees are asked the same questions. Id. When conducting interviews, the interview panel categorizes each interviewee as either "for further consideration," "not for further consideration at this time" or "no further consideration." Dkt. No. 38 at ¶28; Dkt. No. 40 at 18. There is no limit on the number of interviewees who may be categorized as "for further consideration." Id. Depending on the position and the applicants, there may be a second interview. Dkt. No. 40 at ¶19. Human resources takes the "for further consideration" list and conducts criminal background checks. Dkt. No. 38 at ¶29. Interview notes, resumes,

12

cover letters and references for those who pass the background check are given to Evans. Id.

If an internal employee is among the final candidates, Evans may review agency information to look at error rate and customer satisfactory surveys in order to further assess the candidate. Dkt. No. 40 at ¶21. Evans then meets with the associate directors and they decide whom to hire. Id. at ¶22. Evans never has said or implied that employees who have used FMLA leave or filed complaints or grievances with external agencies, such as the EEOC, should not rise within the organization. Id. at ¶23.

E.    Human Services Program Coordinator – Senior - January 2017

On January 20, 2017, the plaintiff interviewed for a Human Services Program Coordinator – Senior position within MilES, one of 68 candidates who interviewed to fill 10 available positions. Dkt. No. 38 at ¶30. The interview panel included Isabel Coriano, Kofi Abaidoo-Asiedu, and Kinen Fleming. Id. at ¶31. The plaintiff did not tell any of the individuals interviewing her for the position that she used FMLA leave, does not have any reason to believe that any of these individuals were aware she used FMLA leave, and does not believe that her use of FMLA leave factored into how they scored her interview. Dkt. No. 39-1 at 9, Tr. Page 33 lines 15-21. All three members of the interview panel graded the plaintiff's interview as "no further consideration." Dkt. No. 38 at ¶32; 38-5 at 1, 7, 13. Based on her performance in the interview, the plaintiff was not selected for a second interview for the Human Services Program

13

Coordinator – Senior position. Dkt. No. 38 at ¶33. There were thirty-five others who were not selected for a second interview. Id.

F.    Income Maintenance Specialist – Advanced – March 2017

On March 8, 2017, the plaintiff participated in a telephone interview for an Income Maintenance Specialist–Advanced position; she was one of seventy-eight candidates who interviewed for the position. Dkt. No. 38 at ¶34. Income Maintenance Specialist–Advanced is a coveted position with many applicants, so recruitment is generally very competitive. Id. at ¶35. The interview panel consisted of Colvin Clark and Courtney Griffin. Id. at ¶37. The plaintiff did not tell either of the individuals interviewing her for the position that she had used FMLA leave and does not have any reason to believe that either of them were aware that she used FMLA leave or factored this into their decision not to offer her the position. Dkt. No. 39-1 at 7, Tr. Page 27 lines 1-7. Based on her performance in the interview the plaintiff received a "no further consideration, at this time," rating and she was not selected for the Income Maintenance Specialist–Advanced position. Dkt. No. 38 at ¶38; 38-6 at 5.

On March 22, 2017, Zbiegien sent the plaintiff a template email informing her she was not selected to advance to the next step in the recruitment process. Dkt. No. 38 at ¶39; Dkt. No. 38-7 at 1-2. That same day, Zbiegien received an email response from the plaintiff in which she asked why she was not selected to move to the next step for either the Human Services Program Coordinator or Income Maintenance Specialist-Advanced positions. Dkt. No. 38-7 at 1.

The plaintiff chose to inquire of Zbiegien why she was not selected for the Income Maintenance Specialist-Advanced or Human Services Program Coordinator positions because Zbiegien was listed on the job description as a person to contact with any questions about the position. Dkt. No. 39-1 at 10, Tr. Page 37 lines 10-19. March 22, 2017 was the first time the plaintiff ever spoke with Zbiegien. Id. at lines 4-9. Zbiegien advised the plaintiff that state agencies are not required to provide feedback to applicants regarding their interview, but explained that the Department of Health Services conducts interviews focusing on job responsibilities of the position and candidates are selected based on their qualifications, how well they perform during the interview, and whether they will be the best fit for the position. Dkt. No. 38 at ¶40; Dkt. No. 38-7 at 1. Zbiegien encouraged the plaintiff to apply for positions as opportunities become available. Id.

G.     Plaintiff's March 2017 EEOC Complaint

In March of 2017, the plaintiff filed a complaint with the EEOC, alleging disability discrimination for the Department's failure to hire her for the Income Maintenance Specialist-Advanced and Human Services Program Coordinator positions. Dkt. No. 39-1 at 10, Tr. Page 38 lines 14-17, Tr. Page 40 lines 19-25; 11, Tr. Page 41 at 1-16. The plaintiff filed her complaint with the EEOC for investigation because she did not feel confident that she could complain to anyone or speak to anyone in confidence at the agency and receive answers as to why she was not selected for the Income Maintenance Specialist-Advanced and Human Services Program Coordinator positions. Id. at 10, Tr. Page 38

15

lines 20-25, Tr. Page 39 lines 1-14. The plaintiff believed that she may have automatically been taken out of consideration for both positions because she used FMLA leave for a medical condition. Id. at 11, Tr. Page 41, lines 21-25.

The plaintiff testified that no one told her and she has not seen any documents that support her contention that she did not receive the positions because she used FMLA leave; she admits it is based solely on her feeling/suspicion. Id. at Tr. Page 44 lines 12-24. The plaintiff did not tell anyone in the Department except her current supervisor, Debra Turner, that she filed a complaint with the EEOC. Id. at 12, Tr. Page 47 lines 7-25; 16, Tr. Page 61 lines 11-22. The plaintiff did not tell Turner the substance of her EEOC complaint but she would inform Turner when she needed time off to deal with the process; Turner did not ask the plaintiff for any details about her complaint and simply told her how to request leave when she needed time off to do things like complete paperwork. Id. at 12, Tr. Page 47 lines 18-25; Tr. Page 48 lines 1-16. The plaintiff does not have any reason to believe that Turner shared with anyone the fact that the plaintiff had filed a complaint with the EEOC. Id. at 16, Tr. Page 61 lines 20-22. The plaintiff is aware that the EEOC investigator spoke with Pamela McGillivray in the Department's Office of Legal Counsel regarding the plaintiff's complaint but is not aware of anyone else at the Department with whom the EEOC investigator may have spoken. Id. Tr. Page 63, lines 6-25; Tr. Page 64 lines 1-5.

The EEOC closed its investigation of the plaintiff's discrimination complaint and told her that they did not find evidence of discrimination. Id. at

16

12, Tr. Page 48 lines 12-15. But the plaintiff felt she hadn't received a chance to provide her "proof," which would have included "[b]asically [her] performance records or [her] experience or, you know, even tell them who were selected, and maybe they could have asked if any of the selected candidates had an FMLA or a disability." Id., lines 17-24. Upon receiving the EEOC's determination regarding her complaint, the plaintiff did not follow up with the EEOC and ask about any conversations they had with the Department or whom they spoke with. Id. at 17, Tr. Page 65 lines 7-10. She also did not ask anyone at the Department if they spoke with the EEOC. Id., lines 11-14. The plaintiff has not been told by anyone employed by the defendant that she will not be considered for promotions because she filed a complaint with the EEOC or because she took FMLA leave, nor has she had any conversations or viewed any documents giving her reason to think she will not be considered for promotions at the Department. Id., Tr. Page 66 lines 14-24.

    H.    Plaintiff' Resignation from and Reapplication to MilES

    In February of 2018, the plaintiff resigned from her position in the Department to work as an Economic Support Specialist - Advanced for Outagamie County, earning approximately $20.88 per hour. Id. at 13. She worked in her position at Outagamie County for four days, when she resigned because she experienced car trouble and could no longer make the commute to Outagamie County. Id. The plaintiff reapplied and rejoined the Department at her old job as an Income Maintenance Specialist in July of 2018. Id. When she rejoined the Department in July of 2018, the plaintiff earned $20.91 per hour,

17

which was greater than the $19 per hour she earned prior to leaving her Income Maintenance Specialist Position for the position in Outagamie County. Id. at 14.

I.   Health Care Supervisor – October 2018

In October 2018, the plaintiff applied for a Health Care Supervisor position. Dkt. No. 38 at ¶41. The screening panel included Health Care Supervisors, Deanna Heron and Matt Kiefer. Id. at ¶42. The screening panel scored the plaintiff' resume and cover letter as a 5.5 on a 9-point scale. Id. at ¶43. Based on the scoring of her resume and cover letter, the plaintiff was not selected for an interview. Id.

J.   Income Maintenance Specialist – Advanced - January 2019

In January of 2019, the plaintiff applied for an Income Maintenance Specialist - Advanced position. Id. at ¶44. The screening panel included Dominique Liddell, Health Care Supervisor; Jerry Turner, Section Manager; and Deb Torrence, Income Maintenance Specialist-Advanced. Id. at ¶45. The screening panel scored the plaintiff's resume and cover letter as a 7.3 on a 9-point scale. Id. at ¶46. Based on this scoring she was not selected for an interview. Id.

K.   Health Care Supervisor – July 2019

In July of 2019, the plaintiff applied for a Health Care Supervisor position. Id. at ¶47. The screening panel included Vanessa Ramirez, Health Care Supervisor and Kinen Fleming, Program & Policy Analyst - Advanced. Id. at ¶48. The screening panel scored the plaintiff's resume and cover letter as a 3

18

on a 9-point scale. Id. at ¶49. Based on this scoring of her resume and cover letter, the plaintiff was not selected for an interview. Id. Zbiegien reviewed the recruitment files for each time the plaintiff applied for the Human Services Program Coordinator–Senior, Income Maintenance Specialist–Advanced, and Health Care Supervisor positions, as well as her personnel file. There is no record of anyone submitting a request to the Department of Administration to remove the plaintiff from any certification list for any positions at the Department. Id. at ¶50.

      L.     Tanya Johnson's Relationship and Knowledge of Plaintiff

Tanya Johnson is a health care supervisor for MilES. Dkt. No. 41 at ¶2. The plaintiff was transferred to Johnson's supervision in April 2016 and was supervised by Johnson through early 2019. Id. at ¶4. In approximately May of 2018, the plaintiff told Johnson she was applying for jobs and asked if she would be a reference for her; Johnson agreed to provide a reference because the plaintiff was a good worker. Id. at ¶6. Johnson never served on a screening or interview panel for a position for which the plaintiff applied. Id. at ¶5.

As the plaintiff's direct supervisor, Johnson was aware of her approved intermittent FMLA leave. Id. at ¶7. Although Johnson was aware that the plaintiff had been approved for and used intermittent FMLA leave, she did not share this information with any other employees. Id. at ¶8. Johnson says that did not tell the plaintiff that employees who used FMLA leave would not be eligible for receiving a discretionary merit compensation (DMC) award. Id. at ¶9. Johnson never told the plaintiff or implied in any way that employees who

19

used FMLA leave would not be entitled to advancement opportunities or awards, such as DMC awards. Id. In fact, in 2016 Johnson nominated another one of her employees—who had used FMLA leave that same year—for a DMC award based on outstanding performance. Id. at ¶10.

### M. Tonya Evans' Relationship and Knowledge of Plaintiff

MilES bureau director Tonya Evans never requested that the plaintiff be removed from the certification list for any of the positions for which plaintiff applied between 2017 and 2019. Dkt. No. 40 at ¶¶24, 25. Evans did not consider the plaintiff for any of the positions at issue in this lawsuit because the plaintiff did not pass the screening and/or interview panels. Id. at ¶26. Prior to this lawsuit, Evans was not aware that the plaintiff applied for and received approval to use FMLA leave. Id. at ¶ 27. While Evans generally is made aware of complaints filed with agencies like the EEOC, as director, she does not focus on the specifics of any complaint until she is informed that the complaint or grievance requires her attention. Id. at ¶28. Evans recalls Zbiegien telling her at some point that the plaintiff had filed a complaint with the EEOC, but she does not recall the particulars of the complaint and she did not make anyone else aware of her complaint. Id. at ¶29. The plaintiff's EEOC complaint never required Evan's attention, Evans was not involved in gathering documents or otherwise responding to the EEOC and she was not contacted by the EEOC for an interview. Id.

N.    Plaintiff's Reasons for This Lawsuit and Current Employment

At first, the plaintiff thought that she was not receiving the promotional opportunities she applied for "because [she] had the FMLA and they would feel like [she] couldn't do the job, but now [she] feels like it's because [she] filed a complaint or, you know – that's all [she's] got." Dkt. No. 39-1 at 17, Tr. Page 67 lines 1-5. The plaintiff believes there is a general hostility toward employees who use FMLA leave. Id. at 5, Tr. Page 18 lines 14-24; 11, Tr. Page 41 lines 18-25; 19, Tr. Page 74 lines 21-25, Tr. Page 75, Tr. Page 76 lines 1-5. The plaintiff says that Johnson once told her that employees who used FMLA are not eligible for DMC awards. Id. at 11, Tr. Page 43 lines 3-14. The plaintiff testified that in 2020 there was an agency-wide email from the director indicating that if someone did not get selected or approved for a holiday off, "if you call in the day before or the day after you will be reprimanded even if you have FMLA." Id. at 5. Tr. Page 18 lines 19-25, Tr. Page 19 lines 1-4. The plaintiff does not believe that the individuals on the screening or interviewing panels are the ones making the final decisions, but that the final decisions are made by Tonya Evans and human resources. Id. at 19, Tr. Page 76 lines 13-18.

The plaintiff suspects that Evans and individuals in human resources who have knowledge of her personnel file may help "wean[] people out" from consideration for positions based on usage of FMLA leave or filing of complaints with the EEOC. Id., Tr. Page 75 lines 7-25, Tr. Page 76 lines 1-5. The plaintiff admits that her feeling that human resources and Evans may be holding her back from promotions based on her use of FMLA leave or filing a complaint

21

with the EEOC is a suspicion and that she hasn't seen any documents or been told by anyone that her suspicion is correct. Id. at 20, Tr. Page 77 lines 2-5. The plaintiff currently works as an Income Maintenance Specialist for the Department. Id. at 3, Tr. Page 9 lines 10-15.

## II.     The Parties' Arguments

The defendant moves for summary judgment on two grounds: (1) the defendant is entitled to sovereign immunity, and (2) the plaintiff's claims fail on the merits because her allegations are unsupported and she cannot show pretext for either the FMLA or the retaliation claim. Dkt. No. 36 at 8. First, the defendant argues that it is a Wisconsin State agency and that sovereign immunity extends to all arms of the state—including state agencies. Id. at 9 (citing Kashani v. Purdue Univ., 813 F.2d 843, 845 (7th Cir. 1987)). The defendant acknowledges that there is an exception to the doctrine for a valid exercise of Congressional power, but argues that the United States Supreme Court and the Seventh Circuit have held that Congress did not validly abrogate the States' sovereign immunity regarding the FMLA's self-care provisions. Id. at 9-10 (citing Coleman v. Court of Appeals of Md., 566 U.S. 30, 33 (2012); Toeller v. Wis. Dept. of Corr., 461 F.3d 871 (7th Cir. 2006)).

The defendant also argues the retaliation claims fail on their merits. Id. at 12. The defendant is willing to assume, for the purposes of summary judgment, that the plaintiff suffered an adverse action when it did not hire her for the open positions. Id. It argues, however, that there is no evidence that the decisionmakers with regard to the Human Services Program Coordinator –

22

Senior and Income Maintenance Specialist – Advanced positions were aware of her FMLA leave or the filing of the EEOC complaint. None of the members of the interview committee knew that the plaintiff had used FMLA leave. Id. at 14. The plaintiff testified that she does not have reason to believe that anyone knew she used FMLA leave or provide any documentary evidence to support her argument. Id. She speculates that Evans may have used information about her FMLA leave to "wean [her] out" of consideration for the positions but the plaintiff made the certification list for both positions and was not removed from either certification list by Evans or human resources. Id. The defendant separately addresses each of the open positions for which the plaintiff applied, making clear that members of the screening panels do not have access to employment files and do not receive information from human resources. Id. at 15. Similarly, the defendant emphasizes that plaintiff admits that she has no reason to believe that anyone screening the applications knew of her EEOC complaint, id. at 18, and the undisputed facts show that she left the defendant's employment and returned, id. at 19. Not only did the defendant rehire her—suggesting that there was no animosity for the FMLA or the EEOC complaint—but she was rehired at "approximately $2 more per hour than she earned prior to her resignation." Id. at 19. Finally, with respect to "suspicious timing," the defendant argues that the plaintiff took leave in 2016 and 2017 and filed the EEOC complaint in March of 2017, but didn't apply for the Health Care Supervisor until October 2018, didn't apply for the Income Maintenance – Advanced position until January 2019, and didn't apply for the Human

Services Program Coordinator – Senior position until November 2019; the defendant alleges that its decisions not to hire the plaintiff for these positions were not "fairly soon" or "very close" to the plaintiff's protected conduct. Id. at 21.

In her opposition filing, the plaintiff does not address any of the defendant's legal arguments; she makes factual assertions that do not appear to be supported by the record. Dkt. No. 43. She says that she applied for the Human Services Program Coordinator—Senior position in January 2017, was interviewed and was not selected. Id. at 1. She had a telephone interview for an Income Maintenance—Advanced position in March of 2018 and was told they did not have information regarding qualifications, and she asks, "[s]o how can they determine who should move on to the next step of the promotion process?" Id. The plaintiff did not receive an interview for the Health Care Supervisor position in October of 2018 or the Income Maintenance Specialist—Advanced position in January of 2019, which she believes was because she had filed a complaint with the EEOC. Id. at 1-2. And she was "deemed Not Eligible" for the Healthcare Supervisor position in July of 2019; again she believes that this was because of her "complaint," because she had been eligible before she filed it. Id. at 2. The plaintiff emphasizes that she has twenty years of experience, including seven years and six months with the Department of Health services in an entry-level position. Id. She says the screening panel is made up of her peers, who pick family members and the people they like. Id. at 3. The plaintiff expresses concern that the panel does not have access to her

24

experience and therefore seems to be rating each candidate on the minimal information they see in an interview or know of personally. Id. The plaintiff points to at least one other candidate who was promoted to a position and whom she says was not qualified: Babatunde Fajembola, whose father and mother work for the agency. Id. at 5. According to the plaintiff, at the time of the interviews she had been employed at MilES for four years and seven months but was not selected because she lacked experience. Id. at 6. She says this was not true; she had fourteen years of "human services" experience before she worked for the defendant. Id.

The plaintiff admits that she left the agency and then returned and admits that she received a raise when she returned, but she say the raise put her "over income guidelines for assistance [she] needed for child care and caused [her] other expense that kept [her] below poverty." Id. at 7. She asserts that she was "[r]aising three children and working hard to move up in a company that is not an equal opportunity employer." Id.

The defendant responds that the plaintiff did not follow the local rule when she filed her opposition materials. Dkt. No. 44 at 2. It also notes that she did not respond to the defendant's legal arguments, particularly the argument that the plaintiff's claims are barred by sovereign immunity. Id. at 3.

### III. Analysis

#### A. Standard

When reviewing a motion for summary judgment, the court views the record and draws all reasonable inferences from it in the light most favorable to

25

the nonmoving party—in this case, the plaintiff. <u>Khungar v. Access Cmty.</u>
<u>Health Network</u>, 985 F.3d 565, 572-73 (7th Cir. 2021). The court does not
weigh evidence or make credibility determinations on summary judgment.
<u>Miller v. Gonzalez</u>, 761 F.3d 822, 827 (7th Cir. 2014). The court is required to
consider only the materials cited by the parties, <u>see</u> Fed. R. Civ. P. 56(c)(3); it is
not required to "scour every inch of the record" for evidence that is potentially
relevant. <u>Grant v. Tr. of Ind. Univ.</u>, 870 F.3d 562, 573-74 (7th Cir. 2017).

      B.    <u>Sovereign Immunity</u>

      The Eleventh Amendment to the Constitution says that the judicial
power of the United States does not extend to suits by citizens against one of
the states. The amendment denies federal courts jurisdiction over suits
brought by an individual against a nonconsenting state. <u>See</u> <u>Seminole Tribe of</u>
<u>Fla. v. Fla.</u>, 517 U.S. 44, 54 (1996). "State agencies are treated the same as
states," and in fact, "a state agency *is* the state for the purposes of the eleventh
amendment." <u>Kroll v. Bd. of Trustees of Univ. of Ill.</u>, 934 F.2d 904, 907 (7th
Cir.1991), <u>cert. denied</u>, 502 U.S. 941 (1991) (citations omitted). <u>See also</u>, <u>Nuñez</u>
<u>v. Ind. Dep't of Child Services</u>, 817 F.3d 1042, 1044 (7th Cir. 2016) ("An agency
of the state receives this same immunity [from private suits in federal court
without their consent].");<u>Whitaker v. Wis. Dep't. of Health Services</u>, 849 F.3d
681, 684 n.1 (7th Cir. 2019) (noting that the Department of Health Services
had been dismissed on sovereign immunity grounds). The plaintiff has not
argued that the defendant waived its immunity or otherwise consented to suit;

26

she says only she disagrees with the defendant's sovereign immunity argument "because the agency is not going to agree to be sued." Dkt. No. 43 at 7.

Congress may abrogate the States' sovereign immunity if it unequivocally expresses its intent to abrogate immunity and has acted pursuant to a valid exercise of power. See Seminole Tribe, 517 U.S. at 73. With respect to the self-care provision of the FMLA, both the United States Supreme Court and the Seventh Circuit Court of Appeals have held that Congress did not validly abrogate the immunity as to that provision. Coleman, 566 U.S. at 35; Toeller, 461 F.3d at 879–80. The plaintiff's claim arises under the self-care provision, 29 U.S.C. §2612(a)(1)(D), because she took leave due to a serious health condition that made her unable to perform the essential functions of her job. Because the state's immunity has not been validly abrogated by Congress, the defendant is entitled to sovereign immunity regarding the claims that it retaliated against the plaintiff for using self-care leave under the FMLA.

      C.    <u>Retaliation</u>

Even if sovereign immunity did not bar the FMLA claim, the court would be required to grant summary judgment in favor of the defendant because the plaintiff has not produced evidence to support her claims. To prevail on a claim for retaliation under the FMLA or the ADA, the plaintiff must prove that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two. Anderson v. Nations Lending Corp., 27 F.4th 1300, 1307 (7th Cir. 2022) (analyzing retaliation claim under the FMLA); Koty v. DuPage Cty., Ill., 900

27

F.3d 515, 519 (7th Cir. 2018) (analyzing retaliation claim under the ADA). The court considers the "evidence as a whole and ask[s] whether a reasonable jury could draw an inference of retaliation." King v. Ford Motor Co., 872 F.3d 833, 842 (7th Cir. 2017) (citing Ortiz v. Werner Enters., Inc. 834 F.3d 760, 764-66 (7th Cir. 2016)).

The defendant does not dispute that the plaintiff engaged in a statutorily protected activity (filing an EEOC claim) or that she suffered an adverse employment action by not getting promoted. The question is whether those two are connected. The plaintiff faces an uphill battle on this element because the undisputed evidence in the record reveals that the screening and interview panels did not have access to employee's records. When a position opens up, Bureau Director Tonya Evans assembles a screening panel of two to three members who score the resumes and cover letters. Dkt. No. 40 at ¶3. That panel uses a nine-point scale developed by human resources. Dkt. No. 38 at ¶22. Members of that panel do not have access to employment records and cannot use personal experience or prior knowledge to rank the applicant. Id. at ¶23. The scores are submitted to human resources, which compiles a certification list based on the scores; that list is given to Evans. Id. at ¶24. No one has the authority to remove the applicant from the certification list without "special written permission from the Department of Administration.". Id. at ¶25.

Evans selects a separate interview panel that does not know the applicant's score and does not have personal information about the employee;

28

all applicants are asked the same questions. Id. at ¶¶26, 27. The interview panel gives each candidate one of three ratings: "further consideration," "not for further consideration at this time" or "no further consideration." Id. at ¶28. Evans and other associate directors—the only ones who would know about the plaintiff's protected activity (filing the EEOC claim)—have no involvement in the decision-making until the interview panel recommends an employee for further consideration. Id. at ¶29.

The plaintiff has presented no evidence that anyone on the selection or interview panels had access to her employment file or knew that she engaged in any protected action. The positions were screened by separate panels. The only people who potentially knew that the plaintiff took FMLA leave or filed a complaint did not score her resume and cover letter and there is no record of anyone submitting a request to remove her from the certification list for any of the open positions. Dkt. No 38 at ¶50; 40 at ¶25. For the first two positions, the interview panels checked "no further consideration at this time" or "no further consideration." Id. at ¶¶32, 38. For the last three positions, the plaintiff never made it past the panel to the certification stage because she scored a 5.5, 7.3 and a 3 respectively on the resume and cover letter screening. Id. at ¶¶43, 46, 49.

The timing of the events doesn't create a genuine issue of material fact because the plaintiff took FMLA leave in 2016 and 2017, yet made the certification list for two open positions in 2017, receiving interviews but "no further consideration" ratings from panelists who did not have access to her

employment records. Dkt. No. 38 at ¶32, 38. The plaintiff resigned in February of 2018 but was rehired five months later at a higher salary than when she left. She did not apply for another open position until October of 2018; she applied for two more open positions in 2019. Each of these positions was screened by separate panels—none of whom had access to the plaintiff's records, knew she had taken FMLA leave or filed an EEOC complaint, and none of them scored her resume and cover letter high enough to advance to the certification list and receive an interview. Id. at ¶43, 46, 49. The fact that the plaintiff was rehired at a higher pay scale casts doubt on her arguments that decisionmakers retaliated against her because of her protected actions.[1]

In reviewing the plaintiff's deposition, the court notes that defense counsel asked the plaintiff why she thought that the defendant took people off the list if they had filed for FMLA. Dkt. No. 39-1 at 11, Tr. Page 42 lines 4-6. The plaintiff said:

> Well, I don't want to be in people's personal business, but it was said prior, because I also had a line or something in there regarding the DMC award or something. And, you know, it was a rumor with the supervisors, and like I said, everybody talked, "oh yeah, you wouldn't have gotten it if you had FMLA."

Id. at lines 7-13. The plaintiff said that Tanya Johnson, her supervisor., made the statement. Id., Tr. Page 43 lines 3-11. But defense counsel specifically

---

[1] The plaintiff says that the fact that she was paid more placed her in a lower income guideline for assistance, dkt. no. 43 at 7; that is not evidence of retaliation. The plaintiff's arguments in her brief are not evidence; the plaintiff did not file a verified complaint or sign her brief under penalty of perjury. The record evidence shows that the defendant hired the plaintiff back despite the fact that she took extensive FMLA leave over the course of two years and filed an EEOC complaint and resigned.

asked whether Johnson or anyone else told the plaintiff that she was not getting promotions because she took FMLA and the answer was an unequivocal "no." Id., Tr. Page 44 lines 12-15. She admitted that it was "just a feeling"—a suspicion—that she had. Id. at lines 19-24. The plaintiff had a similar "suspicion" that people in human resources were shortening the list. Id. at 19, Tr. Page 75 lines 7-25, Tr. Page 26 lines 1-5. Johnson filed a declaration that she never told the plaintiff she would not be eligible for an award because she took leave and, in fact, in 2016 she nominated an employee who had taken FMLA leave that year. Dkt. No. 41 at ¶¶9, 10. Johnson never served on a screening or interview panel for a position to which the plaintiff applied. Id. at ¶5.

Finally, the plaintiff has alleged that the people on the screening and interview committees tended to favor family and friends and sometimes promoted people who were unqualified. Dkt. No. 43 at 5. This perception may give the plaintiff reason to feel that she was treated unfairly, but perceptions and feelings do not constitute evidence that the defendant retaliated against her because she took FMLA leave or filed an EEOC complaint. At summary judgment, the nonmoving party must present "specific facts showing a genuine issue to survive summary judgment." King, 872 F.3d at 841 (quoting Petts v. Rockledge Furniture LLC, 534 F.3d 715, 722–23 (7th Cir. 2008)). Speculation and suspicion are not enough. The court will grant the defendant's motion because there is no evidence to support the plaintiff's claims.

## IV.    Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 35.

The court **ORDERS** that this case is dismissed with prejudice. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 30th day of September, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**